**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | **CRIMINAL NO. DLB-23-183** |
| | * | **CRIMINAL NO. DLB-23-376** |
| AHMED HUSSAIN, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*

## GOVERNMENT'S CONSOLIDATED SENTENCING MEMORANDUM

1

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 3

BACKGROUND ....................................................................................................................... 3

   I.    Procedural History ....................................................................................................... 3

      A.   DLB-23-CR-183: Indictment and Superseding Indictment ............................................. 3

      B.   DLB-23-CR-376: Indictment, Detention, Superseding Information, and Guilty Pleas .. 4

   II.   The Defendant's Criminal Conduct ................................................................................ 4

      A.   The UI Conspiracy (DLB-23-376) .................................................................................. 5

      B.   Defendant's Possession of Firearms and Intended Distribution of a Controlled
Substance (DLB-23-183) ................................................................................................ 6

ARGUMENT .............................................................................................................................. 7

   I.    Sentencing Guidelines ................................................................................................... 8

      A.   Offense Level Calculation .............................................................................................. 8

      B.   There Should be No Reduction for Acceptance of Responsibility .............................. 11

   II.   Section 3553(a) and the Appropriate Sentence .................................................... 12

      A.   The Nature and Circumstances of the Offenses .......................................................... 13

      B.   History and Characteristics of the Defendant .............................................................. 15

      C.   Adequate Deterrence and Protection of the Public ...................................................... 16

   III.   Supervised Release ..................................................................................................... 17

   IV.   Restitution .................................................................................................................... 17

CONCLUSION ......................................................................................................................... 18

**INTRODUCTION**

The United States of America, by and through Kelly O. Hayes, United States Attorney for the District of Maryland, and Harry M. Gruber, Christopher Sarma, and Joseph L. Wenner, Assistant United States Attorneys, hereby submits the following memorandum in aid of sentencing in the above captioned cases, which is scheduled for September 4, 2025 at 10:00 a.m. As set forth below, the government respectfully requests that the Court sentence Defendant Ahmed Hussain ("Ahmed" or "Defendant") as follows:

- Impose a total sentence of 170 months of imprisonment, consisting of: 146 months as to Count One of DLB-23-376 (Conspiracy to Commit Wire Fraud) and Count Two of DLB-23-183 (Possession of a Firearm and Ammunition); the 60 month statutory maximum, concurrent, as to Count Three of DLB-183 (Possession with Intent to Distribute a Controlled Substance); and 24 months' imprisonment on Count Three of DLB-23-376 (Aggravated Identity Theft), to be served consecutive to the above terms.

- Place the Defendant on supervised release for a period of three years.[1]

- Order the Defendant to make restitution of $557,078 to the Maryland Department of Labor.

The government further asks the Court to impose forfeiture consistent with the government's preliminary orders of forfeiture in each respective matter, to be submitted prior to sentencing.[2]

**BACKGROUND**

I.      **Procedural History**

A.   *DLB-23-CR-183: Indictment and Superseding Indictment*

A Maryland federal grand jury indicted the Defendant on one count of Possession of a Firearm and Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1), in May 2023. Indictment, *United States v. Hussain*, ECF No. 1, DLB-23-cr-183, (D. Md. May 18, 2023). Following the Defendant's arrest, the Honorable Ajmel A. Quereshi and the Honorable Deborah

---

[1]      The maximum period of supervised release for Count Two in DLB-23-376 is 1 year.

[2]      The government expects the preliminary orders of forfeiture to include a $557,078 money judgment, along with the items specified in paragraph 14 of the operative plea agreement.

L. Boardman each ordered the Defendant released pending conditions, including home confinement and location monitoring. *Id.* ECF Nos. 14 & 21.

In December 2023, a grand jury returned a superseding indictment, charging the Defendant with four additional counts, including another count of Possession of a Firearm and Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1) (Count Two), and one count of Possession with Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. § 841(a)(1) (Count Three). Superseding Indictment, *Id.* ECF No. 57.

B. *DLB-23-CR-376: Indictment, Detention, Superseding Information, and Guilty Pleas*

In October 2023, the grand jury returned an indictment against Lawrence Harris ("Harris"), the Defendant, Zakria Hussain, Terry Chen, Bryan Ruffin, and Kiara Smith, charging them with multiple criminal offenses, including conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. Indictment, *United States v. Hussein et al.*, ECF No. 1, DLB-23-376 (D. Md. Oct. 24, 2023). Following his arrest for these offenses, the Defendant remained released on home confinement and location monitoring conditions. *Id.* ECF Nos. 11-15. In November 2024, the Defendant was arrested three months after he had absconded from pre-trial supervision. He then consented to detention. ECF No. 85.

The government filed a superseding information in January 2025, which charged the Defendant in Count One with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and in Count Two with aggravated identity theft, in violation of 18 U.S.C. § 1028A. *Id.* ECF No. 92. Later that same month, the Defendant pled guilty before this Court to those counts. *Id.* ECF Nos. 95-98. At the same hearing, the Defendant also pled guilty in DLB-23-183 to Counts Two and Three of the Superseding Indictment. Crim. No. DLB-23-183, ECF Nos. 100-102.

II.    **The Defendant's Criminal Conduct**

As detailed in the Plea Agreement and stipulated facts, the Defendant engaged in multiple

4

separate and distinct forms of criminal conduct. *First*, he played a significant role in a sprawling conspiracy to steal real individuals' identities, exploit Maryland Department of Labor's response to the COVID-19 pandemic, and defraud the Maryland unemployment insurance program. *Second*, he was trafficking marijuana and possessed a firearm in relation to his drug-trafficking activities. *Third*, and while on supervision pending trial, the Defendant removed his location monitoring device and fled from supervision for over three months until he was arrested by detectives with the Prince George's Police Department.

### A.  The UI Conspiracy (DLB-23-376)

For over a year, the Defendant worked with his co-conspirators to defraud the Maryland Department of Labor ("MD-DOL"), multiple financial institutions, and identity theft victims to obtain fraudulent unemployment insurance ("UI") benefits. The Defendant's fraud came at the height of the pandemic, when Maryland and the United States had expanded access to unemployment benefits and employed contractors through Company #1 to review an influx of UI applications and administer benefits. Essentially, two of the Defendant's co-conspirators had access to the MD-DOL's internal databases through their employment with Company #1. The co-co-conspirators—including the Defendant—then exploited that access to redirect unemployment benefits meant for real people to their own bank accounts and to file fraudulent benefit claims with the use of stolen identities. The Defendant admits that the UI fraud conspiracy resulted in $3.5 million in loss, and that he personally participated in claims resulting in over $550,000 in loss.

In order to redirect and file fraudulent UI claims, the Defendant and his co-conspirators took several coordinated and intricate steps. These included using their surreptitious access to MD-DOL databases: (1) to change information on existing UI claims; (2) to make numerous false statements regarding purported applicant's identity, employment status, wages, and eligibility to fraudulently inflate the amount of benefits received; (3) to both upload and approve certain

documents in support of UI claims; and (4) to remove MD-DOL's internal fraud holds on certain UI claims and certify weeks of unemployment for payment in the MD-DOL system, among other actions, all to facilitate the payment of fraudulent UI benefits. Moreover, the Defendant and his co-conspirators ensured that the fraudulent benefits flowed into bank accounts they controlled.

The Defendant's own fraudulent conduct was repeated and steadfast. As detailed in the statement of facts, the Defendant used at least six email addresses, including his own Google email (ahmedhussain10190@gmail.com), as the contact email for multiple false UI claims. To perpetuate the ongoing fraud, he communicated with his co-conspirators to coordinate the use of the Company #1 computers to adjust and file UI claims. For example, the Defendant and other members of the conspiracy shared images and screenshots of various UI data entry emails. The Defendant also informed his co-conspirators about the status of various UI claims, at one point advising them that he was coming over to "check on a couple accts see y they ain't pay." He later linked debit cards with fraudulent UI benefits to his personal Cash App account, transferred funds from these cards into his Cash App account, and used the funds to buy luxury goods—including $21,200 of diamonds for a Cartier watch. This conduct required the Defendant's use of the personal identifying information of over 10 victims. The statement of facts further details numerous examples where the Defendant and his co-conspirators adjusted existing UI claims (Identity Victim #7 and Identity Victim #8, for example), fraudulently induced the MD-DOL to issue UI benefits, and then transferred money from those claims onto bank cards and accounts that the Defendant controlled.

B. *Defendant's Possession of Firearms and Intended Distribution of a Controlled Substance (DLB-23-183)*

In November 2022, law enforcement discovered the Defendant possessing multiple fire arms despite a prior federal felony conviction. The Defendant also possessed more than 60 pounds of marijuana, over $5,000 in cash, and drug distribution baggies.

Specifically, when law enforcement searched the Defendant's room within a residence he shared with co-defendant Lawrence Harris, the Defendant was knowingly possessing a stolen Honor Defendant 9mm handgun along with 229 rounds of ammunition of varying calibers. The Defendant admits that he possessed this firearm and ammunition despite being previously convicted of an offense punishable by more than one year. The Defendant also admits that he possessed the handgun in relation to his drug trafficking activities. Indeed, in the same search of the Defendant's room, law enforcement also found approximately 60 pounds of marijuana, complete with small baggies as well as cash.

Law enforcement also searched an attic in the Defendant's residence. In the attic, law enforcement found two large duffle bags containing 33 pounds of marijuana subdivided into 30 smaller bags. A third duffle bag contained a Black Ruger AR-15, a Black Chiappa 9mm Rifle, and corresponding ammunition. Two hand guns—a Masterpiece Arms 9mm and a .45 Automatic Model 21 pistol equipped with a full-auto sear switch—were also found near the duffle bags. In the statement of facts, the Defendant admitted to having joint possession of these items.

### C.  Defendant's Flight

While the Defendant was released on location monitoring pending trial for these two underlying cases, he successfully absconded from pre-trial supervision. Specifically, in August 2024, the Defendant removed his location monitoring device and fled from home confinement. Authorities were unable to locate the Defendant until November 2024, when he was arrested by Prince George's County Police. Following this arrest, the Defendant was charged with first degree assault, malicious destruction of property, and six counts of possession of controlled substances. That case has now been placed on the STET docket.

## ARGUMENT

The government submits that—after calculating the applicable sentencing guidelines,

resolving the parties' guideline dispute, and analyzing the appropriate factors under 18 U.S.C. § 3553(a)—a total sentence of 170 months' incarceration is the appropriate sentence.

**I.      Sentencing Guidelines**

The government recommends that the Court adopt the guidelines calculation listed in the parties' plea agreement, which slightly differ from those in the Presentence Report. *See* Plea Agreement, DLB23-376, ECF No. 97 ("Plea Agreement"); Presentence Report, DLB-23-376, ECF No. 105 ("PSR"). The government also asks this Court to withhold any offense level reduction for acceptance of responsibility.

*A. Offense Level Calculation*

In DLB-23-376, pursuant to the Plea Agreement and PSR prepared by the U.S. Probation Office, the base offense level is seven (7). There is a fourteen (14) level increase in the offense level based on a loss amount of more than $550,000. The offense level is then increased by six (6) additional levels from the following enhancements: (i) two (2) levels, pursuant to U.S.S.G. § 2B1.1(b)(2)(A), because the offense involved 10 or more victims; (ii) two (2) levels, pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the scheme involved sophisticated means, and the Defendant intentionally engaged in or caused the conduct constituting sophisticated means; and (iii) two (2) levels, pursuant to pursuant to U.S.S.G. § 2B1.1(b)(11)(A)(ii), because the scheme involved the use of an authentication feature. Finally, there is an agreement that the offense level should be increased by two (2) levels, pursuant to U.S.S.G. § 3C1.1, because the Defendant obstructed or impeded the administration of justice with respect to the prosecution of the instant offense of conviction and the obstructive conduct related to the Defendant's offense of conviction and any relevant conduct. This results in an adjusted offense level of twenty-nine (29).

In DLB-23-183, pursuant to the Plea Agreement and PSR, Counts Two and Three of the Superseding Indictment group for guideline calculation purposes because one of the counts

embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the count. PSR ¶ 52. However, the parties and the PSR differ in their positions as to how the appropriate offense level.

Under the Plea Agreement, the parties stipulated to calculations for Count Two and Count Three that both result in an offense level of 22. As to Count Two—which is where the parties differ from probation—the base offense level is fourteen (14) under U.S.S.G. § 2K2.1(a)(6). The following enhancements apply to increase the offense level to 22: two (2) levels, pursuant to U.S.S.G. § 2K2.1(b)(4), because the firearm was stolen; and four (4) levels, pursuant to U.S.S.G. § 2K2.1(b)(6), because the Defendant used or possessed the firearm in connection with another felony offense. The two (2) level enhancement, pursuant to U.S.S.G. § 3C1.1 for the Defendant's obstruction of justice, brings the offense level to 22.

The PSR, however, calculates the offense level to be 30. *See* PSR ¶¶ 59-66. Specifically, it reasons that the base offense level is twenty (20) under U.S.S.G. § 2K2.1, because the offense involved a machine gun as defined in 18 U.S.C. § 5845(a) and the Defendant was a prohibited person at the time of the offense. In addition to the stolen firearm (2 levels) and possession in connection with another felony offense (4 levels) enhancements described above, the PSR also applies a two (2) level enhancement under U.S.S.G. §2K2.1(b)(1)(A), reasoning that the offence involved five firearms. With the two (2) level enhancement pursuant to U.S.S.G. § 3C1.1 for the Defendant's obstruction of justice, the offense level to would be 30.

The significance of this difference is apparent under the multiple count adjustment rules. *See* U.S.S.G. §3D1.4. Under the parties' position, because the offense level for DLR-23-183 (22) is seven levels less than the offense level for DLR-23-376 (29), the total number of units between the two cases is one and the corresponding overall adjusted offense level would therefore be thirty

(30). With a criminal history category of III[3], the Defendant's advisory guidelines range would be 121-151 months. Under the PSR's position, however, two (2) additional offense levels should be added to the offense level for DLR-23-183 (30), resulting in an adjusted combined offense level of thirty-two (32), which based on criminal history category of III, would suggest an advisory range of 151-188 months' incarceration.

The government asks the Court to follow the calculation as set forth in the plea agreement. As explained in the Stipulation of Facts, the Defendant had access to the attic where law enforcement recovered marijuana and numerous firearms. Because the Defendant had access to the attic, he could access the items in the attic. Based on text message communications obtained during the investigation, the Defendant was engaging in a drug-trafficking business with his co-defendant Lawrence Harris. Because the Defendant and Harris were working together to traffic marijuana, the Defendant had joint control over the marijuana found in the attic, which is why those amounts are included in the Guidelines calculation for Count Three of the Superseding Indictment in DLB-23-183. As to the firearms, there was not a similar joint enterprise.

In addition to the adjusted offense level for Count One in DLB-23-376 and Counts Two and Three in DLB-23-183, the guidelines and statute provide for a sentence of 2 years' imprisonment for Count Two in DLB-23-376, which must be consecutive to any other sentence imposed. *See* 18 U.S.C. § 1028A(a)(1); U.S.S.G. § 2B1.6. Moreover, the Court cannot alter its sentence on the grouped counts to take into account the mandatory minimum on Count Two in DLB-23-376. *See* 18 U.S.C. § 1028A(b)(3) ("in determining any term of imprisonment to be imposed for the felony during which" the defendant used a means of identification, "a court shall not in any way reduce the term to be imposed for such crime so as to compensate for, or otherwise

---

[3] The government concurs with the PSR's assessment that the Defendant has a criminal history category III.

10

take into account, any separate term of imprisonment imposed or to be imposed for a violation of this section").

### B. There Should be No Reduction for Acceptance of Responsibility

The government anticipates that the Defendant will ask for an acceptance of responsibility reduction under U.S.S.G. § 3E1.1(a), despite his obstruction of justice enhancement.[4] But to do so, the Defendant "must show that he has done something atypical or beyond the ordinary course either to take responsibility or to minimize the effects of his own obstruction to merit the reduction." *United States v. Harris*, 890 F.3d 480, 488 (4th Cir. 2018). He cannot.

"Ordinarily, the two-level reduction is not available when the defendant has received an enhancement for obstruction of justice under § 3C1.1 of the Guidelines." *Harris*, 890 F.3d at 488. (citing U.S.S.G. § 3E1.1. cmt. 4.). The Defendant bears the burden to show that there are "extraordinary" circumstances justifying such a reduction, and "must make a heightened showing of acceptance of responsibility." *Id.* (citing *United States v. Hudson*, 272 F.3d 260, 264 (4th Cir. 2001)). Here, Defendant can do neither; "this is not an extraordinary case that would warrant acceptance of responsibility in the face of obstruction of justice." *United States v. Perrin*, 551 F. App'x 694, 697 (4th Cir. 2014).

As explained above and in the PSR, while released on conditions pending trial, the Defendant removed his location monitoring device and fled home confinement in August 2024. The Defendant remained on the lam for over three months. He was not apprehended by authorities until November, and only then by chance. As explained in the PSR, Prince George's County police officers happened to observe the Defendant commit several traffic violations in his 2014 Maserati Quattroporte. When law enforcement attempted to stop the vehicle, the Defendant tried to flee,

---

[4] The Plea Agreement provides that the government will oppose any such reduction, while the Defendant reserves his right to argue that he is entitled to it. *See* Plea Agreement at 7.

colliding his car into two police cruisers. When the Defendant's vehicle became stuck, he exited the vehicle and ran before he was apprehended. As the PSR reports, the Defendant's vehicle was found to contain multiple controlled substances and drug paraphernalia. *See* PSR ¶91.

Defendant cannot point to extraordinary circumstances that undo this conduct. In explaining the circumstances where both the obstruction enhancement and the acceptance reduction could apply, the Fourth Circuit has speculated that perhaps "a defendant who escapes custody might be able to demonstrate an exceptional circumstance if he immediately turns himself over to authorities." *Harris*, 890 F.3d at 488 (citing *United States v. Gregory*, 315 F.3d 637, 641 (6th Cir. 2003)). Not so here. The Defendant absconded from court supervision for three months. Not only that, but the Defendant struggled to flee until the bitter end, forcing law enforcement to pin his car and subsequently track him down on foot. Such conduct "clearly evin[ces] a desire to evade responsibility indefinitely." *Id.* (citing *United States v. Knight*, 606 F.3d 171, 172, 177 (4th Cir. 2010) (affirming denial of reduction because defendant fled while out on bond)). Indeed, the Defendant "was only brought back into the justice system by an arrest, not by surrender." *Knight*, 606 F.3d at 177. Where a Defendant flees pending proceedings and fails to turn himself in, courts in the Fourth Circuit routinely deny acceptance of responsibility credit.[5] This case is no different. The Court should refrain from granting such a reduction.

## II.    Section 3553(a) and the Appropriate Sentence

As this Court is well aware, it must impose a reasonable sentence that is sufficient but no

---

[5] *See, e.g.*, *Harris*, 890 F.3d at 488 (affirming denial of acceptance credit where defendant cut ankle monitor while on bond, fled jurisdiction, and failed to "voluntarily cease his obstructive conduct" before being arrested); *United States v. Hudson*, 272 F.3d 260, 263 (4th Cir. 2001) (reversing district court's application of acceptance credit where defendant had failed to appear for sentencing and "actively eluded apprehension by the police for more than six months" before arrest); *United States v. Lewis*, 282 F. App'x 254, 254–55 (4th Cir. 2008) (affirming denial of acceptance credit when defendant "failed to appear at his original sentencing hearing and was arrested approximately seven weeks later"); *United States v. Brown*, 438 F. App'x 203, 205 (4th Cir. 2011) (affirming denial of acceptance credit "given [Defendant's] fugitive status").

greater than necessary to achieve the goals of sentencing, based on multiple factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," the need "to promote respect for the law," the need for just punishment without unwarranted sentencing disparities and the need for both specific and general deterrence. 18 U.S.C. § 3553(a). The government will address all of these factors at the sentencing hearing but addresses some of them below. Based on these factors, a total sentence of 170 months, consisting of 146 months as to Count One of DLB-23-376 and Count Two of DLB-23-183; the 60-month statutory maximum, concurrent, as to Count Three of DLB-376; and 24 months imprisonment on Count Three, to be served consecutive to the above terms—is appropriate.

### A.   The Nature and Circumstances of the Offenses

This Defendant has committed not one, but two sets of offenses. Both are serious and disturbing. One is a stunning financial fraud that exploited individual victims, financial institutions, and public institutions at a time when society was navigating an unprecedented economic and public health crisis. In the other, the Defendant possessed multiple firearms and copious ammunition in connection with dealing illicit substances, exposing his community to potential violence. Both merit a significant sentence.

***The UI fraud***. The context of this offense is key. The Defendant and his co-conspirators defrauded their victims during an ongoing pandemic. In 2021, businesses were still reeling from COVID-19-related closures and loss of business, and Marylanders had lost their jobs or were working reduced hours. UI played a vital role providing individuals with a lifeline to keep their families safe, housed, and fed. Recognizing this, Congress expanded UI benefits and eligibility throughout the pandemic. And the MD-DOL enlisted remote contractors through Company #1 to screen claims and handle increased volume.

The Defendant, on the other hand, saw an opportunity to commit fraud. He and his co-

conspirators used and obtained Company #1 credentials to fraudulently alter the UI claims of real people using MD-DOL's internal databases, inflating these claims and directing hundreds of thousands of dollars into the Defendant's and co-conspirators' bank accounts. This caused profound harm. Real Marylanders lost access to their UI funds in the middle of the pandemic. The MD-DOL lost UI funds to a criminal conspiracy. Banks and financial institutions unknowingly transferred fraudulent UI funds under their care. While the U.S. and Maryland taxpayer bears the monetary loss in this case, the Defendant's conduct harmed the real vulnerable people whose identities he stole.

The Defendant himself advanced this scheme in multiple essential ways. He coordinated the fraudulent use of Company #1's laptops among his co-conspirators. He used his own personal email address and others to change the contact information and misdirect UI claims away from real claimants. And he directly benefitted in the fruits of his scheme. He loaded debit cards and bank accounts under his control with fraudulent proceeds. He used those funds to purchase—among other things—tens of thousands of dollars' worth of diamonds. The Defendant was not a minor player in this conspiracy; he was all in.

Moreover, it is important to note that the Defendant's advisory guidelines range reflects solely the UI funds that he personally participated in obtaining. Since the overall conspiracy involved funds exceeding $3.5 million, the government asks this Court to consider the government's conservative approach to loss in this case and reject any requested downward variance from the guidelines proposed by the defense.

***The Firearm and Drug Offenses.*** Near contemporaneously with the UI fraud scheme, the Defendant was also found illegally possessing firearms and distribution-level quantities of marijuana. The number of firearms and amount of ammunition here is striking. Not only did the Defendant have a stolen 9mm handgun and over 200 rounds in his room, but there were also two

semi-automatic rifles, two additional handguns (one modified with a full auto switch), and dozens of rounds of corresponding ammunition in his attic. Dozens of pounds of marijuana, drug distribution baggies, and cash were kept alongside these firearms.

While the Defendant did not use this arsenal on this occasion to commit a violent act, the fact that the Defendant felt the need to arm himself with so many firearms and so much ammunition is telling regarding the violent nature of the drug trade. *See Orrego Goez v. United States*, 2023 WL 2045970, at \*4 (S.D. Fla. Feb. 16, 2023) ("Guns and drugs 'are a dangerous combination' – as courts across the country have consistently found.") (citation omitted). Moreover, it also is illustrative of the scope of his furtive drug operation. Such a scope deserves a significant sentence.

    B.  *History and Characteristics of the Defendant*

The Defendant's crimes were not an aberration or a one-time lapse in judgment. Rather, they constituted a continuous and well-thought-out course of conduct—the UI fraud in particular. The quantity of stolen identity information the Defendant and his co-conspirators possessed, the command of that information, and the constant coordination of his co-conspirators cannot be ignored.

These crimes are another entry in this Defendant's growing criminal record. He had already been convicted of illegally possessing regulated firearms twice in Prince George's County Circuit Court (in 2019 and 2020), and was convicted second degree escape when he cut his ankle monitor while on supervision in 2020. PSR ¶¶ 76 & 78. Despite these convictions, the Defendant entered the UI fraud conspiracy shortly after being released. And his prior gun offenses did not stop him from possessing even more guns as part of his drug distribution efforts soon after.

Moreover, as reflected above, the Defendant has demonstrated that he lacks respect not only for the law but also for others. The Defendant repeatedly victimized people by stealing their identities to commit fraud and then tried to flee while pending trial in this case. The Defendant

chose to flee despite a prior conviction for fleeing home confinement on state supervision. *See* PSR ¶77. It's notable that even when released pending trial and under the duress of a potentially significant federal sentence, the Defendant's criminal behavior continued. Accordingly, the Defendant's history and characteristics paint a grim picture and warrant a significant sentence.

### C. Adequate Deterrence and Protection of the Public

The facts demonstrate that this Defendant is both an economic and physical danger to those around him. His sentence should appropriately reflect the requisite protection of the public and the need to deter future criminal conduct.

Sophisticated fraud schemes like the Defendant's require deterrence that only can be accomplished through a significant period of incarceration. "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotations omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id*. at 1227. The Fourth Circuit has recognized the importance of incarceration for defendants convicted of white-collar crimes such as tax evasion, theft, fraud, and embezzlement. *See, e.g.*, *United States v. Engle*, 592 F.3d 495, 501 (4th Cir. 2010). As evidenced by the scope of the Defendant's criminal conduct, cases such as this involving individual benefits fraud, counterfeiting, and false documents are difficult to detect.

The Defendant's exploitation of a high-profile relief program during an unprecedented pandemic also heightens the importance of general deterrence. Programs created by the CARES Act (like expanded UI benefits and eligibility) were designed to get money to people in need as quickly as possible. In times of national calamity, the United States must be able to aid its citizens expeditiously and with streamlined bureaucratic scrutiny. And yet it is precisely the lack of

16

scrutiny that this Defendant (and many others) wrongfully exploited. The imposition of criminal penalties severe enough to deter others who may seek to take similar advantage of public largesse in future disasters is critical. The anonymous, online nature of these offenses will otherwise prove too tempting to far too many. Undeterred fraud of this sort will also undermine public support for similar relief efforts even when they are unquestionably needed. The Defendant's sentence will serve as a warning and deterrent to others inclined to exploit future relief programs. Therefore, a lengthy sentence is necessary to protect the public and provide both specific and general deterrence to others who might think to use another national emergency for personal financial gain.

Indeed, a lengthy sentence is also necessary to specifically deter this Defendant. Despite prior criminal history, this Defendant engaged in long term fraud, while at the same time ignoring his prohibition of firearm possession and entering the large-scale drug trade. The Defendant then proceeded to abscond from supervision while these cases were pending. Therefore, only a significant term of imprisonment can deter this Defendant from future violations of law.

## III.    Supervised Release

The government asks the Court to further sentence the defendant to three years of supervised release. In addition to the conditions of supervised release set forth in the presentence report, the government urges this Court to consider imposing some or all of the following additional special conditions:

- Disclose to Pretrial Services all phone numbers used by the Defendant on a monthly basis;

- Prohibit the use of encrypted communication applications such as Telegram and WhatsApp; and

- Require the Defendant to obtain prior approval from Pretrial Services for any financial transactions exceeding $10,000.

## IV.    Restitution

The government asks that this Court impose restitution order of $557,078 to the MD-DOL.

17

The government has been advised by defense counsel that the Defendant agrees to a restitution order in this amount. Additional information for the MD-DOL in included in the table below.

| Victim | Total Actual Loss Amount |
|---|---|
| Maryland Department of Labor Benefit Payment Control Unit, Room 206 1100 N. Eutaw St. Baltimore, MD 21201 | $557,078.00 |

## CONCLUSION

For the reasons set forth herein and further discussed at the sentencing hearing, the government respectfully requests that the Court sentence the Defendant as follows:

- Impose upon the Defendant a total sentence of 170 months of imprisonment

- Place the Defendant on supervised release for a period of three years.

- Impose forfeiture consistent with the government's preliminary orders of forfeiture in each respective matter, to be submitted prior to sentencing.

- Order restitution of $557,078 to the MD-DOL.

The government views this recommended sentence to be sufficient, but not greater than necessary, to achieve the purposes of sentencing.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

_____/s/_____
Harry M. Gruber
Christopher Sarma
Joseph L. Wenner
Assistant United States Attorneys

18

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing government's filing was served via email on the defendant's counsel.


_____/s/_____
Joseph L. Wenner
Assistant United States Attorney