## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. DLB-23-cr-183** |
| | * | **CRIMINAL NO. DLB-23-cr-376** |
| **LAWRENCE NATHANIAL HARRIS,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**\*\*\*\*\*\*\***

### GOVERNMENT'S CONSOLIDATED SENTENCING MEMORANDUM

The United States of America, by and through Kelly O. Hayes, United States Attorney for the District of Maryland, and Harry M. Gruber, Christopher Sarma, and Joseph L. Wenner, Assistant United States Attorneys, moves this Court to sentence Defendant Lawrence Nathanial Harris ("Harris") to the following:

- A total period of 228 months' incarceration in the Bureau of Prisons ("BOP"), consisting of:
  - 144 months as to Count One of the Indictment in DLB-23-cr-376 (Conspiracy to Commit Wire Fraud) and Count Two of the Superseding Information in DLB-23-cr-183 (Possession with Intent to Distribute a Controlled Substance);
  - the 120-month statutory maximum, concurrent, as to Count One of the Superseding Information in DLB-23-cr-183 (Possession of a Machinegun);
  - 24 months on Count Seventeen of DLB-23-cr-376 (Aggravated Identity Theft), consecutive to all other terms; and
  - 60 months on Count Three of the Superseding Information in DLB-23-cr-183 (Possession of a Firearm in Furtherance of the Drug Trafficking Crime), consecutive to all other terms;

- Supervised release of three years on all counts, except Count Seventeen in DLB-23-cr-376, which has a maximum period of supervised release of one year; and

- Restitution of $952,225 to the Maryland Department of Labor and a $500 special assessment.[1]

---

[1]     The government's restitution calculation is set forth *infra* at 25. The government further asks the Court to impose forfeiture consistent with the government's preliminary orders of forfeiture, which are being separately submitted.

## TABLE OF CONTENTS

BACKGROUND ......................................................................................................................... 3

I.      Procedural History.................................................................................................... 3

II.     Harris's Criminal Conduct ...................................................................................... 4

    A.    Harris's Possession of a Machine Gun, Additional Firearms, and Intended Distribution of a Controlled Substance (DLB-23-cr-183).................................................................... 5

    B.    The Unemployment Insurance Conspiracy (DLB-23-cr-376)..................................... 10

III.    Sentencing Guidelines.............................................................................................. 12

IV.    Section 3553(a) and the Appropriate Sentence ........................................................... 14

    A.    The Nature and Circumstances of the Offenses........................................................... 15

    B.    Harris's History and Characteristics ............................................................................ 21

    C.    Adequate Deterrence and Protection of the Public....................................................... 22

    D.    The Need to Avoid Unwarranted Sentencing Disparities............................................. 24

V.     Restitution ................................................................................................................. 25

CONCLUSION............................................................................................................................ 26

**BACKGROUND**

## I.   Procedural History

On May 18, 2023, a federal grand jury in the District of Maryland indicted Harris on one count of Felon in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1). Indictment, *United States v. Harris*, ECF No. 1, DLB-23-cr-183 (D. Md. May 18, 2023). Following his arrest in September 2023, Harris pleaded not guilty and consented to pre-trial detention. *Id.* ECF Nos. 31 & 33.

In October 2023, a grand jury in the District of Maryland returned an indictment against Harris, Ahmed Hussain ("Ahmed"), Zakria Hussain ("Zakria"), Terry Chen ("Chen"), Bryan Ruffin ("Ruffin"), and Kiara Smith ("Smith"), charging them with multiple criminal offenses, including conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One). Indictment, *United States v. Harris et al.*, ECF No. 1, DLB-23-cr-376 (D. Md. Oct. 24, 2023). The Indictment also charged Harris with aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count Seventeen). *Id.* Harris remained detained.

In December 2023, the grand jury returned a superseding indictment in DLB-23-cr-183, charging Harris with three additional counts, including one count of Possession with Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. § 841(a)(1) (Count Three); one count of Conspiracy to Distribute a Controlled Substance, in violation of 21 U.S.C. § 846 (Count Four); and one count of Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 21 U.S.C. § 924(c) (Count Five). DLB-23-cr-183, Superseding Indictment, ECF No. 57. On November 26, 2023, Harris moved for pre-trial release. *Id.* ECF No. 54. The Court held a bond review hearing on January 5, 2024 and ordered Harris detained pre-trial. *Id.* ECF No. 64.

On July 24, 2025, the grand jury returned a second superseding indictment against Harris in DLB-23-cr-183, charging him with a total of five counts: Felon in Possession of a Firearm and

3

Ammunition, in violation of 18 U.S.C. § 922(g)(1) (Count One); Possession with Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. § 841(a)(1) (Count Two); Conspiracy to Distribute a Controlled Substance, in violation of 21 U.S.C. § 846 (Count Three); Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. §924 (c)(1)(B)(ii) (Count Four); and Opening, Using, and Maintaining a Drug-Involved Premises, in violation of 21 U.S.C. § 856(a)(1) (Count Five). *Id.* ECF No. 124.

In August 2025, the government filed a three-count superseding information in DLB-23-cr-183, charging Harris with Possession of a Machinegun, in violation 18 U.S.C. § 922(o) (Count One); Possession with Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. § 841(a)(1) (Count Two); and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 21 U.S.C. § 924(c). Superseding Information, *Id.* ECF No. 127.

On August 7, 2025, Harris pleaded guilty before this Court to Count One and Count Seventeen in DLB-23-cr-376. ECF Nos. 118-120. At the same hearing, Harris also pleaded guilty in DLB-23-cr-183 to Counts One, Two, and Three of the Superseding Information. Crim. No. DLB-23-cr-183, ECF Nos. 131-33.

## II.    Harris's Criminal Conduct

As detailed in the Plea Agreement and stipulated facts, Harris engaged in significant criminal conduct with respect to two distinct criminal operations. The first was a marijuana distribution effort, in which Harris possessed a machine gun, multiple additional firearms, and hundreds of rounds of ammunition. The second was a sprawling conspiracy to steal real individuals' identities, exploit Maryland Department of Labor's response to the COVID-19 pandemic, and defraud the Maryland unemployment insurance program of millions of dollars. Harris's intimate involvement in important aspects of both schemes, as well as the amount of loss

4

he caused and sought to cause in the COVID-19 fraud, set him apart from his co-conspirators, especially when considering his extensive criminal history.

### A. Harris's Possession of a Machine Gun, Additional Firearms, and Intended Distribution of a Controlled Substance (DLB-23-cr-183)

i.    October 26, 2022 Traffic Stop[2]

On October 26, 2022, in broad daylight, law enforcement saw a dark Gray Porsche Macan SUV (the "Porsche") with heavily tinted windows and windshield. After confirming that the car had fake temporary registration plates, law enforcement pulled over the Porsche.

Law enforcement approached the Porsche where Harris was the driver and sole occupant. While speaking with Harris, law enforcement smelled burnt marijuana and ordered Harris out of the Porsche. During a search of the Porsche, Harris told law enforcement, there "wasn't nothing illegal." Nevertheless, law enforcement found several grams of suspected marijuana in the Porsche. Law enforcement attempted to check the glovebox in the Porsche, but it was locked. Upon request, Harris provided law enforcement the key fob to the Porsche so that law enforcement could open the glovebox. Law enforcement found a Glock 27 Handgun loaded with a 30-round magazine. A Glock Auto Switch was attached to the Glock 27 Handgun.

For the contraband found in the car, Harris pleaded guilty in the Circuit Court for Prince George's County and received a sentence of 5 years all but 18 months suspended. He was released on October 6, 2023. DLB-23-cr-376, ECF No. 145 ("PSR") at 23.

ii.    November 16, 2022 Search Warrant at 4325 Delmar Avenue

---

[2] The facts of the traffic stop come from a search warrant affidavit, which the Government attached at DLB-23-cr-183, ECF No. 123-1. Harris has not contested the veracity of these statements during the litigation.

On November 16, 2022, law enforcement executed a residential search warrant at 4325 Delmar Avenue, Temple Hills, Maryland, which was a residence where Harris lived along with co-defendant Ahmed Hussain and several other individuals. That residence is shown below.



Before entering the residence, police officers announced their presence. After they did so, Harris threw a .380 caliber semi-automatic pistol model 42, manufactured by Glock Inc. as well as a duffle bag full of marijuana from his bedroom window. Harris possessed the Glock in furtherance of his drug-trafficking activities and possessed the marijuana with the intent to sell it. A picture of the Glock lying outside Harris's bedroom window is included below.



During the search of the Delmar Residence, law enforcement searched the attic to which Harris had access. Harris knowingly had joint possession of the items recovered in the attic.

Specifically, within the attic, law enforcement found a large black duffle bag containing 23 large, heat-sealed bags. Each heat-sealed bag contained approximately one pound of marijuana. In total, the black duffle bag had approximately 26 pounds of marijuana.



Law enforcement also found in the attic a large red duffle bag that contained seven large bags of marijuana that weighed approximately one pound each. In total, the red duffle bag had approximately 11 pounds of marijuana.



Along with the 11 pounds of marijuana in the red duffle bag, law enforcement also found the following weapons and accessories in the attic:

- Black Ruger AR-15 .556 Caliber, bearing serial number #855-95377.

- Black Chiappa PAK 9mm Rifle, #RON2025342.

- (1) Magazine for the Chiappa.

- (2) Fifty-Round AR Drum Mags (loaded).

- (2) Thirty-Round AR Magazines (loaded).

- (1) Masterpiece Arms 9mm "Mac 9", Serial Number #Fl 5430, loaded with an extended magazine containing approximately 38 rounds of ammunition.

- (1) .45 semi-automatic pistol, Model 21, bearing serial number BLEY949, which was equipped with a full-auto sear switch, containing 24 rounds of ammunition.

Several photos of the firearms in the attic are below. The last two photos show the machinegun.











Law enforcement later recovered a video from Harris's phone that Harris took of himself holding the Glock switch with a stack of cash. Exhibit 1 (Harris with Glock Switch) (Native Exhibit).[3]

### B. The Unemployment Insurance Conspiracy (DLB-23-cr-376)

Beginning in or about January 2021, Harris worked with his co-conspirators to defraud the Maryland Department of Labor ("MD-DOL"), multiple financial institutions, and identity theft victims to obtain fraudulent unemployment insurance ("UI") benefits. Harris's fraud began at the height of the pandemic, when Maryland and the United States had expanded access to unemployment benefits and employed contractors through Company #1 to review an influx of UI applications and administer benefits. Harris interacted to a significant degree with the co-

---

[3] Law enforcement can identify Harris in this video, and other videos discussed below, through Harris's distinctive arm and hand tattoos.

conspirators (Kiara Smith and Bryan Ruffin) who had insider access to the MD-DOL's internal databases through their employment with Company #1. Many of the communications occurred between Smith, and later Ruffin, and Harris. Harris exploited the insider access to redirect unemployment benefits meant for real people to their own bank accounts and to file fraudulent benefit claims with the use of stolen identities. Harris has admitted that he personally participated in claims resulting in over $550,000 in loss, but the government's restitution calculation sets his loss amount at almost twice that amount. Based on the claims tied to the various email addresses, phone numbers, and identities that Harris admitted to using in his Statement of Facts, Harris was personally involved in causing $952,225 in actual loss. *See infra* at 25.

In order to redirect and file fraudulent UI claims, Harris and his co-conspirators took several coordinated and intricate steps. These included using their surreptitious access to MD-DOL databases: (1) to change information on existing UI claims; (2) to make numerous false statements regarding purported applicant's identity, employment status, wages, and eligibility to fraudulently inflate the amount of benefits received; (3) to both upload and approve certain documents in support of UI claims; and (4) to remove MD-DOL's internal fraud holds on certain UI claims and certify weeks of unemployment for payment in the MD-DOL system, among other actions, all to facilitate the payment of fraudulent UI benefits. Moreover, Harris and his co-conspirators ensured that the fraudulent benefits flowed into bank accounts they controlled.

In this loose confederacy, Harris repeatedly took control of the Company #1 laptop and ardently worked to file claims or submit false information to cause existing claims to fraudulently pay out the most amount of benefit money. On multiple occasions, co-conspirators accused Harris of: monopolizing the use of co-conspirator Smith's Company #1 laptop for his own fraud, using the wrong credentials to take off fraud holds, and generally interfering in his co-conspirators' illicit

use of the Company #1 laptop. Harris did this with the intent of maximizing his personal benefit.

As time wore on, Harris's relationship with Smith obviously frayed, as reflected in his messages in furtherance of the conspiracy. In 2022, Harris wrote: "Y'all be catering to her (referencing Smith) like she sum god." Harris's residence became a haven not only for the firearms and drugs involved in DLB-23-cr-183, but also the fraudulent use of the laptop. For example, in April 2022, Ahmed wrote about using the Company #1 laptop for fraud at Harris's residence, writing:    "Get us out the way every night when we at ur house on laptop." By April 2022, Harris was writing about how he should be entitled to use the laptop for fraud, writing: "I got da laptop wit me till tomar nite," "How many people in dis chat knew dat [relative of Zakria] and zak was wit da laptop ina lab yesterday," and "I let it be know I was gettin laptop." Harris then focused on working with Ruffin (whom he referred to as "[a]notha plug" to his co-conspirators) to gain illicit access to MD-DOL's internal system and direct fraudulent UI claims into bank accounts under his and his co-conspirators' control.

Messages show that Harris prepared and submitted a significant volume of fraudulent UI claims. Typically, once Harris received false MD-DOL credentials, Harris would use his access to personally alter the particular claims that real individuals had already made. Harris would then alter the claimant's contact information to his own, upload false documents (to help remove any existing fraud flags) and back date to increase the amount of UI that claim would receive, then alter the bank account where the UI funds would be deposited. The stipulation of facts illustrates how Harris repeated this pattern over and over to hijack dozens of UI claims.

## III.    <u>Sentencing Guidelines</u>

The government agrees with the PSR calculations that the final offense level for the counts without mandatory minimum sentences—Count One of DLB-23-cr-376 (Conspiracy to Commit

Wire Fraud, 18 U.S.C. § 1349), Count One of DLB-23-cr-183 (Possession of a Machinegun, 18 U.S.C. § 922(o)), and Count Two of DLB-23-cr-183 (Possession with Intent to Distribute a Controlled Substance)—following the applicable enhancements, grouping, the multiple count adjustment, and acceptance of responsibility is 27. *See* DLB-23-cr-376, ECF No. 119 ("Plea Agreement") at 6-8; PSR at 16-19.

The underlying calculation for Count One in the Superseding Information in DLB-23-cr-183, which groups with Count Two of the Superseding Information, represents a base offense level of twenty (20), which is increased by (i) two (2) levels because the firearm was stolen; (ii) two (2) levels because the offense involved three or more firearms; and (iii) four (4) levels because Harris used or possessed the firearm in connection with another felony offense, resulting in an adjusted offense level of twenty-eight (28). PSR at 17-18.

The underlying calculation for DLB-23-cr-376 represents a base offense level of seven (7), with a fourteen (14) level increase due to losses that were more than $550,000, but less than $1,500,000. In the plea agreement, the parties stipulated that the offense level should be increased (i) by two (2) levels because the offense involved 10 or more victims; (ii) by two (2) levels because the scheme involved sophisticated means, and Harris intentionally engaged in or caused the conduct constituting sophisticated means; and (iii) by two (2) levels because the scheme involved the use of an authentication feature, resulting in an adjusted offense level of twenty-seven (27). *Id.* at 17.

Under the multiple count adjustment rules, two (2) levels are added to the adjusted offense level of DLB-23-cr-183—the higher offense level of the two cases. *Id. a*t 18. The government agrees with the PSR that Harris should then receive a three-level reduction for timely acceptance of responsibility. *Id.* at 18-19. This results in a total offense level of Harris's Criminal History

Category VI, the advisory Guidelines range for these counts is 130-162 months. This is consistent with the government's requested sentences of 144 months' incarceration as to Count One of DLB-23-cr-376 (Conspiracy to Commit Wire Fraud) and Count Two of DLB-23-183 (Possession with Intent to Distribute a Controlled Substance), and 120-months' incarceration, concurrent, as to Count One of DLB-23-cr-183.

Harris has also pleaded guilty to two offenses with mandatory minimums that must be imposed consecutive to all other sentences imposed by this Court. Count Three of DLB-23-cr-183—Possession of a Firearm in Furtherance of a Drug Trafficking Crime—is a five-year mandatory minimum sentence, consecutive to any other sentence. *See* PSR at 18 ; Plea Agreement at 7. Count Seventeen of DLB-23-cr-376—Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A—carries a mandatory two year minimum sentence, consecutive to any other sentence.[4] *See* PSR at 17; Plea Agreement at 7.

## IV.  Section 3553(a) and the Appropriate Sentence

As this Court is well aware, it must impose a reasonable sentence that is sufficient but not greater than necessary to achieve the goals of sentencing, based on multiple factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," the need "to promote respect for the law," the need for just punishment without unwarranted sentencing disparities and the need for both specific and general deterrence. 18 U.S.C. § 3553(a).

---

[4] Moreover, the Court cannot alter its sentence on the grouped counts to take into account the mandatory minimum on Count Two in DLB-23-cr-376. *See* 18 U.S.C. § 1028A(b)(3) ("in determining any term of imprisonment to be imposed for the felony during which" the defendant used a means of identification, "a court shall not in any way reduce the term to be imposed for such crime so as to compensate for, or otherwise take into account, any separate term of imprisonment imposed or to be imposed for a violation of this section").

The government will address all of these factors at the sentencing hearing, but addresses some of them below. Based on these factors, a total overall sentence of 228 months' imprisonment is appropriate.[5]

### A. The Nature and Circumstances of the Offenses

Harris has committed two sets of serious and disturbing unlawful conduct. First, he possessed multiple firearms and copious ammunition in connection with dealing illicit substances, exposing his community to potential violence. Second, Harris committed a major financial fraud with multiple co-conspirators, including those with insider access to trusted government databases, that exploited individual victims, financial institutions, and public institutions at a time when society was navigating an unprecedented economic and public health crisis. The combined harm caused by Harris's extensive criminal conduct in these two matters, combined with his noteworthy criminal history, merit a significant sentence at the top end of the agreed upon C-plea range.

### i. The Firearm and Drug Offenses

In 2022, while the UI fraud scheme was up and running, Harris was also found illegally possessing a machine gun, other firearms, and distribution-level quantities of marijuana. The Guidelines for the counts of conviction understate the nature and circumstances of Harris's criminal conduct related to the guns and drugs offenses.

---

[5] Under the Plea Agreement, the parties have agreed that a total term of imprisonment between 132 months and 228 months is the appropriate disposition of this case pursuant to the § 3553(a) factors. Plea Agreement at 8-9.

*Gun Possession.* As described above, Harris possessed an arsenal of guns. The Mac9 and the machine gun found in the attic were both loaded with more than two dozen rounds each. For the AR-15, law enforcement received (2) fifty-round drums and (2) thirty-round drums, all of which were loaded. Harris did not have a legitimate job. He made his money committing fraud and dealing drugs. The Court should infer that he possessed these guns to protect his drug-trafficking and fraud money.

The evidence also suggests that Harris possessed guns other than those obtained during the search warrant execution at the Delmar Avenue Residence. That evidence is summarized below.

*Guns at Tucker Road.* Before being arrested on November 16, 2022, Harris was subject to location monitoring for a Washington, D.C. case. He had told his Washington, D.C. probation officer that he was living at the 4325 Delmar Avenue residence. On October 11, 2022, Harris wrote the following message to co-defendant Ahmed Harris.[6]

| | | | |
|---|---|---|---|
| From: +12027132812 _$!<Other>!$_ (owner) | | | |
| To: +12403153367 Osama | | | |
| Aye u gotta keep dem bags at da tucker rd spot and we gotta put all dese extra irons dere too and jus keep what we toatin!! At least till I get off dis curfew and can change my addy u kno I'm still on dis box shyt dem peoples cud come hit dis joint wenevaa | | | |

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +12403153367 Osama | 10/11/2022 7:32:03 PM(UTC-4) | | |

Status: Sent

10/11/2022 7:32:02 PM(UTC-4)

---

[6] This message was obtained from a phone search warrant for one of Harris's phones.   He is the 202-713-2813 number. Co-defendant Ahmed Harris went by the nickname "Osama" and has been linked to the 240-315-3367 number.

As evidenced in the message exchange, Harris and his co-defendant, Ahmed, were also storing guns ("irons") at a residence on Tucker Road in Oxon Hill ("da tucker rd spot"). They were only keeping some of these guns at the Delmar Avenue residence. Law enforcement never executed a search warrant at the Tucker Road residence in relation to this investigation.

*Glock Switch in Porsche*. On October 26, 2022—a little more than two weeks before the search warrant execution—law enforcement recovered a Glock 27 with an auto switch from inside of Harris's Porsche. *See supra* at 5. He pleaded guilty to possessing that gun in state court.

*Pictures with Other Guns*. While reviewing Harris's cell phones pursuant to search warrants, law enforcement found photos of Harris posing with guns that were never recovered. A few examples are below.





Not only did Harris possess numerous guns, but he also carried them outside of his house, which suggests he was willing to use them offensively. *See* Exhibit 2 (Harris with AK) (Native Exhibit); Exhibit 3 (Harris with Gun in Vehicle) (Native Exhibit); Exhibit 4 (Harris & Others with Guns in Vehicle) (Native Exhibit). Harris captioned this last video "Can't hang round me if u ain't stepping shyt ain't safe."



The government interprets that message to be a warning to members of the community: do not threaten Harris unless you want a gun battle.

***Drug Trafficking.*** The Guidelines captures the amount of marijuana that law enforcement seized during the search warrant at the Delmar Avenue Residence. At the time of recovery, law enforcement estimated that marijuana to have a street value of $897,878. See DLB-23-cr-183, ECF No. 110-1 at 32, USA_000146. That amount—though large—does not consider the prior drug sales that Harris conducted with different individuals. Evidence from his phones indicates that Harris had engaged in prior drug sales and used online platforms to market drugs. For example, in one video, he displayed a series of marijuana bags and captioned the video "Bagz N." A screenshot from that video is below.



\*\*\*\*

Harris will likely point out that he did not use his guns violently. The Court should nevertheless impose a long sentence for these offenses, because Harris was arming himself because

he was engaging in drug trafficking. *See Orrego Goez v. United States*, 2023 WL 2045970, at *4 (S.D. Fla. Feb. 16, 2023) ("Guns and drugs 'are a dangerous combination' – as courts across the country have consistently found.") (citation omitted).

ii.     The Unemployment Insurance Fraud

Beginning in or about January 2021, Harris worked closely with Smith and Ruffin, who worked for Company #1 to use insider access to the MD-DOL systems, as well as multiple co-conspirators such as Ahmed Hussain, Zakria Hussain, and Terry Chen, to defraud the government and multiple individuals during an ongoing pandemic. While businesses were still reeling from COVID-19-related closures and loss of business, and Marylanders had lost their jobs or were working reduced hours, Harris and his co-conspirators were taking advantage of a vital lifeline to Marylanders who were suffering financially and seeking to keep their families safe, housed, and fed. Recognizing this, Congress expanded UI benefits and eligibility throughout the pandemic. And the MD-DOL enlisted remote contractors through Company #1 to screen claims and handle increased volume.

Through Smith and Ruffin, Harris used and obtained Company #1 credentials to fraudulently alter the UI claims of real people using MD-DOL's internal databases, removing fraud flags on existing claims, inflating claims and directing hundreds of thousands of dollars into Harris's and co-conspirators' bank accounts. This caused profound harm. Real Marylanders lost access to their UI funds in the middle of the pandemic. The MD-DOL and the federal government lost UI funds to a criminal conspiracy. Banks and financial institutions unknowingly transferred fraudulent UI funds under their care.

Harris himself advanced this scheme in multiple essential ways. The text messages seized from his and other co-conspirators' phones show that he arranged the fraudulent use of Company

20

#1's laptops among his co-conspirators, frequently commandeering these laptops from his own co-conspirators to submit more fraudulent claims. He used multiple email addresses to change the contact information and misdirect UI claims away from real claimants. And he directly benefitted from the fruits of his scheme to the tune of over half a million dollars. When one co-conspirator (Smith) grew frustrated with his behavior, he moved on to working with another MD-DOL insider (Ruffin) so that he could continue to exploit illicit access to Maryland's unemployment system. Harris's initiative fueled the conspiracy's success and longevity.

Moreover, the adjustments to the guidelines for the fraud conspiracy demonstrate in a real sense the serious nature of Harris's criminal conduct. This was a conspiracy not just driven by loss amounts, but also by the sophisticated and complex nature of the scheme, the insider access, the use of genuine driver's licenses and other documents with authentication features, and many individual victims.

B. *Harris's History and Characteristics*

These cases only add to Harris's already astounding criminal record. Not only is it lengthy, but it also illustrates the breadth, variety, and increasing severity of Harris's offenses. He has multiple Simple Assault convictions in Washington D.C., two years apart. PSR at 21-22. Harris also has a disturbing series of six sexual misconduct offenses between 2014 and 2022. *See* PSR at 19-20 (Lewd, Indecent, or Obscene Acts (2014), Harris sat next to a Metro passenger and "turned around with his penis exposed in full view of the public"); *id.* (Indecent Exposure (2015), Harris approached a Metro passenger and "was holding a $20 bill in one hand and his shirt up with his other hand and the victim observed his fully exposed penis"); *id.* 20-21 (Sex Abuse (Misdemeanor) (2016), Harris "touched the buttocks of the victim"); *id.* at 21 (Indecent Exposure (2016), while Harris was standing over the victim on a Metro train, she "felt a substance hit her hair and on her

21

left shoulder . . . she recognized the look and smell of the substance to be semen")[7]; *id.* at 21-22 (Sex Abuse (Misdemeanor) (2017), Harris "plac[ed] his hands on the victim's buttocks"); *id.* at 22 (Sex Abuse (Misdemeanor) (2022), Harris "penetrated the victim's vulva with his penis where he knew or had reason to know the victim was . . . incapable of declining participation in the sexual act").

Particularly relevant to this case is Harris's 2022 firearms offense. *Id.* at 23. As discussed above, law enforcement discovered a loaded handgun with a 30-round magazine in Harris's glovebox during a vehicle search. Harris committed this offense less than a month before the search of his house that led to the charges in DLB-23-cr-183.

Being caught with one firearm did nothing to deter Harris from continuing to stockpile weapons and ammunition to further his drug trade. Nor did his prior criminal sentences discourage him from joining a multifaceted fraud conspiracy and stealing dozens of identities for his own monetary gain. As difficult and as tragic as Harris's upbringing was, the severity of Harris's compounding criminal conduct, the harm he has caused to victims, and the continuous disregard he has demonstrated to his neighbors and community warrant a significant sentence.

C. *Adequate Deterrence and Protection of the Public*

These twin cases—and Harris's prior record—demonstrate that Harris is both an economic and physical danger to those around him. As to the latter, Harris's penchant to mix firearms and drugs continues to place the public in danger. Having one firearm seized by law enforcement did

---

[7] A recording of the plea and sentencing hearing for this case is attached as a native exhibit. *See* Exhibit 5, Plea and Sentencing Hearing Recording, *State v. Harris*, Case No. 0D00352842 (Dist. Ct. Mont. Cnty. Aug. 18, 2016). At the hearing, the victim stated that she "ha[s] post-traumatic stress disorder because of this incident" and "it's something that I think about every single day").

little to discourage Harris from continuing to possess the other firearms at his Delmar Avenue residence. Nor did it discourage him from encouraging others to hide his additional firearms at Tucker Road while he was on supervised release. *See supra* at 16. His sentence should appropriately reflect the requisite protection of the public and the need to deter his future criminal conduct.

Sophisticated fraud schemes like Harris's also require deterrence. "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotations omitted). As evidenced by the scope of Harris's criminal conduct, cases such as this involving individual benefits fraud, insider access to computers and government databases, and the use of false documents as well as the improper use of real documents with authentication features are difficult to detect. The Fourth Circuit has recognized the importance of incarceration for defendants convicted of similarly elusive white-collar crimes such as tax evasion, theft, fraud, and embezzlement. *See, e.g.*, *United States v. Engle*, 592 F.3d 495, 501 (4th Cir. 2010).

The UI fraud scheme also carries a particular need for general deterrence. Harris's exploitation of a high-profile relief program during an unprecedented pandemic also heightens the importance of general deterrence. Congress expanded UI benefits and eligibility to get money to people in need as quickly as possible. The United States must be able to aid its citizens expeditiously and with streamlined bureaucratic scrutiny in an emergency. And yet it is precisely the lack of scrutiny that Harris wrongfully exploited. The imposition of criminal penalties severe enough to deter others who may seek to take similar advantage of public largesse in future disasters is critical. Undeterred fraud of this sort will also undermine public support for similar relief efforts

even when they are unquestionably needed. A lengthy sentence is necessary to deter others who might think to use another national emergency for personal financial gain.

### D. *The Need to Avoid Unwarranted Sentencing Disparities*

Harris is the second co-defendant in both the DLB-23-cr-376 and DLB-23-cr-183 cases to be sentenced. (Four defendants in DLB-23-cr-376 remain to be sentenced.) The government anticipates that Harris will argue that a sentence at the high end of the C plea range would result in an unwarranted sentencing disparity between Harris and co-defendant Ahmed Hussain. Not so.

First, such an argument "focuses on the wrong kind of disparity." *United States v. Lawson*, 128 F.4th 243, 257 (4th Cir. 2025). The Fourth Circuit has made clear that "§ 3553(a)(6)'s primary purpose is to fulfill the 'Guidelines' goal' 'to eliminate unwarranted sentencing disparities *nationwide.*'" *Id.* (quoting *United States v. Withers*, 100 F.3d 1142, 1149 (4th Cir. 1996)) (emphasis in original). A "sentence is not 'unreasonable under § 3553(a)(6) merely because it creates a disparity with a co-defendant's sentence.'" *United States v. Gillespie*, 27 F.4th 934, 945 (4th Cir. 2022) (quoting *United States v. Pyles*, 482 F.3d 282, 290 (4th Cir. 2007)).

There is no unwarranted disparity in this case, just as there was no unwarranted disparity in *Lawson*, where the appellant claimed there was an unwarranted disparity between him and his co-conspirator. That co-conspirator had initially received the same 78-month sentence as the appellant but was later resentenced to 46 months. *Lawson*, 128 F.4th at 257. The panel rejected Lawson's argument, holding that "the district court evaluated Lawson's conduct under all of the § 3553(a) factors and based its sentence on that individualized assessment," and finding that Lawson failed to offer evidence "that his sentence was out of line with nationwide sentences." *Id.* Given that the government's sentencing recommendation here is in the middle of the applicable guidelines, Harris cannot show such a disparity either.

Moreover, a sentencing disparity between Ahmed Hussain and Harris is warranted under the § 3553(a) factors. While both committed similar sets of conduct, important distinctions merit a significantly higher sentence for Harris. Harris, not Ahmed, was caught possessing a machinegun as part of his marijuana distribution operation. Harris, not Ahmed, is captured in numerous photographs carrying firearms which have not been recovered by law enforcement. Harris is responsible for nearly twice the loss amount that Ahmed was in the UI case. Harris further pleaded guilty to 18 U.S.C. § 922(c), a five-year mandatory minimum; Ahmed did not. Harris's record earned him the highest Criminal History level under the U.S.S.G.; Ahmed's did not. A meaningfully higher sentence for Harris is justified on multiple grounds.

## V. <u>Restitution</u>

The government asks that this Court impose restitution of $952,225. The government gathered the UI claims that could be tied to facts that Harris admitted to regarding his involvement, namely the specific email addresses that Harris admitted to using "in furtherance of UI fraud, including by having the contact email address for multiple purported claimants in the MD-DOL system changed to" these email addresses. *See* Stipulation of Facts, ECF No. 119-1 at 9. The government then added up the confirmed amounts paid on these UI claims from the point Harris's information was added to each claim in MD-DOL's system through either the end of the conspiracy or the point the claim was changed to a different email address. This conservative approach results in a loss amount of $952,225. Additional information for a restitution order to MD-DOL is included in the table below:

| Victim | Total Actual Loss Amount |
|---|---|
| Maryland Department of Labor Benefit Payment Control Unit, Room 206 1100 N. Eutaw St. Baltimore, MD 21201 | $952,225.00 |

**CONCLUSION**

For the reasons set forth herein and further discussed at the sentencing hearing, the

Government respectfully requests that the Court sentence Harris as follows:

- Impose a total period of 228 months' incarceration in the Bureau of Prisons ("BOP"), consisting of 144 months as to Count One of DLB-23-cr-376 (Conspiracy to Commit Wire Fraud) and Count Two of DLB-23-cr-183 (Possession with Intent to Distribute a Controlled Substance); 120 months' incarceration, concurrent, as to Count One of DLB-23-cr-183; 24 months' incarceration on Count Seventeen of DLB-23-cr-376 (Aggravated Identity Theft), consecutive to all other terms; and 60 months' incarceration on Count Three of DLB-23-cr-183 (Possession of a Firearm in Furtherance of the Drug Trafficking Crime), consecutive to all other terms;

- Place the Harris on supervised release of three years;

- Order Harris to make restitution of $952,225 and to pay a $500 special assessment.

- Impose forfeiture consistent with the government's preliminary orders of forfeiture in each respective matter.

Respectfully submitted,

Kelly O. Hayes
United States Attorney


  /s/             
Harry M. Gruber
Christopher Sarma
Joseph L. Wenner
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Government's filing was served via CM/ECF on the defendant's counsel.

_____/s/_____
Joseph L. Wenner
Assistant United States Attorney